United States Soccer Federatio v. United States National Soccer Good morning. May it please the court, Melissa Sherry for appellant. The issue on appeal in this case is a narrow one. Did the arbitrator interpret the agreement between the parties or did he modify it? Here, both in what the arbitrator said and in what the arbitrator did, it is clear that he exceeded the scope of his authority when he granted the Players Association a right to pre-approve non-video creatives that cannot be found anywhere in the language of the fully integrated written agreement. Here, he reached that result even though he admitted that there is no explicit provision anywhere in the agreement providing a pre-approval right for non-video creatives, even though there is an explicit provision providing a pre-approval right for video creatives, even though there are more than 25 other provisions throughout the agreement providing pre-approval notice or review rights in a variety of different circumstances, even though it's a fully integrated agreement that cannot be modified except by writing, and even though the arbitrator's authority here was limited, he could not add to, subtract from, or otherwise alter the terms of the parties' agreement. Now the Players Association acknowledges that there is no textual ambiguity here, that the arbitrator did not find any textual ambiguity. There's no word, there's no phrase, there's no provision that the arbitrator found to be ambiguous. At best, he suggested some ambiguity by what the agreement did not say, ambiguity by silence. But silence generally does not equal ambiguity, particularly when we're talking about a fully integrated agreement. When the parties spell out individual rights and obligations of both parties, the rights that are not included are because those individuals or those parties do not have those particular rights. Now the Players Association says that, well, when there's a yawning void that cries out for an implied term, then it's okay for the arbitrator to essentially read an implied term into the agreement. But these yawning void cases come up only when the agreement is not plausibly complete without the implied term, and that's not the case here. In common parlance, if you say you have the right to do X or Y, and if you do Y, you need to ask me first, there's no ambiguity as to whether you also have to ask me before you do X. Even in common parlance, if I tell my daughter that she can go out with her friends at night, but if she's going to come home after 10, she has to call me. There's no ambiguity as to whether she also has to call me if she comes home before 10. At the outset, though, you point out that it says whether, I guess the arbitrator framed this. This is what's perplexing, is that apparently there wasn't an agreement to this preface he put, whether the United States Soccer Federation, under the terms of the collective bargain agreement and the uniformed players' agreement, is required by the terms of the agreement, and it says, or pass dealings between the parties to submit to the United States soccer team players for its advanced review. Now, did both sides have some understanding that this was the preface, or did he just start with that in his opinion? He started with that, so both sides presented their statement of the issue, and he lays out in the beginning of the award the two different statements of the issue, and the players' association statement also adopted that disjunctive phrasing, whether it's the terms of the agreement on the one hand, or whether it's past practice on the other, and so I think that's where he got that language from, and the reason we point to that language, because I think it shows the problem with the arbitrator's decision, that he ultimately viewed this as an either-or scenario, and viewed past practice to be on par with the terms of the written agreement, and then ultimately in the end of his decision, elevated past practice over the written terms of the agreement, so that's how he starts by presenting that issue. Well, where did that come from? Did your side agree to that, that or pass dealings between the parties to submit to the United States? No, we didn't. If you look at page, separate appendix, if you look at page 68, it's the beginning of the arbitrator's award, and it says... Is that the appendix? This is the separate appendix that we filed with our brief, and it has the arbitrator's award in it, and it also has the language of the collective bargaining agreement and the uniform. What page is that on? It's on page 68. 68? Yeah. Okay. Okay, and so on the top, you see the two block quotes, so the first block quote is how the players' association framed the issue, and if you just skim down a little bit, they phrased it similarly. They talked about whether this is on the second line, whether it's contractually required or required by past practice, so that was the players' association framing of the issue before the arbitrator. Our framing of the issue comes below that, where it says U.S. Soccer stated the issue as follows, and we did not use this either-or formulation. We spoke specifically about the terms of the collective bargaining agreement, and so, as we pointed out in the brief, we think the arbitrator both started in the wrong place by viewing this as an either-or formulation and ultimately ended in the wrong place when, if you skip ahead a bit to page 105 of the separate appendix when he comes to his conclusion, what he says is, yes, I see this chart that you gave me that has 25-plus provisions where you actually do grant express approval or notice rights, especially I recognize it's provided however language where it says there is preapproval for video creatives, and that's all relevant, and then in the very next sentence, he says, however, I just can't ignore the past practice, and then he continues on to say it would defy sound judgment if I paid attention to what the parties did not do, in other words, did not add a written term to the agreement providing this right, and didn't pay attention to what the parties did do, in other words, past practice, and so that's where the analysis, I think, started in the wrong place and ultimately ended in the wrong place. It didn't come from the language of the contract as the arbitrator's award was required to. That's the limit of his authority. Instead, it came exclusively from this non-contractual source from past practice, and if you look, so I think both by what the arbitrator said and by what the arbitrator did, it's clear that he exceeded his authority. We, you know, in the briefs and today, we recognize that the standard of review of arbitration awards is limited, but it's not negligible, and this Court has time and time again said that we will look to what the arbitrator said, but we'll also look to what the arbitrator did. It's not enough to simply make noises of contract interpretation. It's not enough to dress up policy desires in contract interpretation clothing. It's not enough to simply pay lip service. If there's no possible interpretive route between the contract and the arbitrator's award, if there's no plausible foundation for the award, in those circumstances, this Court has and must set aside the arbitration award, and that's what happened here. How many image provisions are there? You know what I'm saying? So for player's likenesses, Section 6 of the agreement is all about the use of player's likenesses, so Section 6, that's for the number of different provisions, instances where they're being used for licensing purposes, this is where goods are being sold to consumers, instances where it's being used for non-commercial uses, where it's being used to promote, for example, an upcoming match, what we're talking about here, which is ads or promotion, it talks about footage. This is a really detailed section. In fact, the entire agreement is quite detailed in that respect, and in Section 6 alone, when it talks about all of these different uses, there's more than six times in which it spells out when there is advanced approval, when there's advanced review, and it does so in some detail. It oftentimes says, you know, when there needs to be notice, what the notice needs to look like, when the other side needs to respond. If they don't respond, whether it's deemed approved, you know, what the standard that applies is, these are very detailed provisions, and it's detailed with respect to video creatives as well. When you get down to this section, it says that U.S. Soccer has the right to use player's likenesses for sponsor ads or promotions subject to certain conditions. There has to be six or more players. This is a team concept. You need to ask the sponsor to make a voluntary contribution to the player pool, and then it says, provided, however, if it's a video creative, you also need to get the advanced approval of the players' association. In the next section, this is 6F2, goes on to say, the reason why we need advanced approval in these limited circumstances is because there's a greater likelihood that there's going to be, or perceived to be, implied endorsement by individual players when you have a video creative greater than what? Greater than a non-video creative. The arbitrator here read that provision to essentially say, provided, however, if there's a video creative, you need advanced approval. Oh, and also, by the way, if it's not a video creative, you also need advanced approval. That's not how the contract reads. It's not how it plausibly can be read. I think it's common sense. This court decided a case in 1995. I apologize, it's not in the brief, but it's called Baxter Healthcare, and your honors, you were on the panel. It was quite a while ago, but I think it sort of stands for this common sense proposition. It was a medical device case, and it was a distribution agreement that said there's exclusive distribution rights with respect to new products, and it didn't say anything with respect to existing products, and so the plaintiff there argued, well, I think there should also be exclusive distribution rights with respect to existing products, and the court said that would be illogical. It would be illogical to read a limited, exclusive distribution right for new products to existing products, and we think the same rationale applies equally here. It would seem that, at least in the media, that this particular problem that we're here today on is not unique to soccer. Other major league sports have this image issue about compensation. Oh, absolutely, and that's why there is so much... Well, I was going to ask you, has there been any effort or was there any discussion on comparing what major league baseball or major league football or what other sports, what those provisions are? I don't know, and it's not in the record, but I imagine the parties that we're negotiating are probably, yeah, fairly well aware of what's going on with respect to other sports, and speaking of which, there's a lot of uses that issue it. This is not a one-sided agreement in any respect. There's times where U.S. soccer has approval rights because the players want to do certain things with respect to team uniforms, for example, or names or logos. In each of those instances, the contract is specific in what can be done, when it can be done, and who has to look at it first, and here, none of that is there. It's something that the arbitrator read into the agreement. Well, the thing I keep coming back to, though, is past dealings. I mean, that seems to be the pivotal issue here, that the arbitrator took that into consideration. I know that the district court talks about what could be somehow an ambiguity or something and kind of meander around there, but this, for me at least, is where he was going to consider past dealings. And that seems to be what's not in the contract, but at the same time, it's in this preface, and that's why I'm wondering, did everybody say that's okay, or is this a surprise to you? It's a surprise to us that he decided that past dealings could be considered. Our view was that the terms of the contract control the Players Association's entire argument was based on past dealings. Our view before the arbitrator has always been that you're limited to the written terms of the contract, that we have an integration clause that says quite clearly, you don't get to look outside the four corners of the contract, you can't modify the contract unless you're doing it in writing. And so I think the reason it was framed that way is because the Players Association's entire argument was based on, not on the contract, but on this idea of past dealings. And I think that's, again, where the arbitrator started, thinking that it was appropriate to look at past dealings. Our position was that it wasn't, you know, you could not look behind that door at all. Okay, but that's at least the problem. And maybe he thought, did think it was a green light to look to past dealings, I don't know. Obviously this is pretty contentious, I even heard this morning where women are thinking they're not getting paid enough, so you know, there's lots of issues going on, but I just look at this as, yeah, it's not in the contract, and they all admit that. And yet here in the preface it says, yeah, well, he's going to look at past dealings. And that's exactly our objection, and that's why we are here today, because we think the arbitrator should have stayed with the contract, not looked at past dealings, and in doing so exceeded the scope of his authority by adding those past dealing terms to the contract where they didn't exist. There does seem to have been a very consistent hewing to showing both print, getting approval both for print creatives and video, even in that sort of contentious situation with the, like Jimenez or whichever the... In this case, El Jimedor, yeah. Thank you, Jimedor. So there's almost this outward appearance that there must be something requiring pre-approval of print creatives, because it was happening all the time. It was sort of routine. I mean, I don't know if that's what led the arbitrator there, and maybe that's beyond the scope of the record, but people seemed to feel compelled to do it, regardless of the language of the contract. If I can make three points on that, number one, I do think that's sort of the temptation that the arbitrator gave into when he said, yeah, the contract says this, but I just can't see what was going on in practice, and that's just not the arbitrator's role to do that. As far as what was going on in practice, it's not something we're challenging here, because we understand the standard of review, but our view and the record before the arbitrator in all due respect was that the reason we were doing this for a number of years was not because we thought the contract required it, but it was a business judgment. It was just easier to get the Players Association to sign off on things beforehand rather than to activate an ad, have them object after the fact, file a grievance, and then we'd sort of be embarrassed by having, if they're successful, having to pull the ad. It would be embarrassing for us and our sponsors, and it was just that after a while, the difficulty in getting pre-approval, the inconsistency, the unreasonableness of the Players Association's approach to this process, after a while, it just was outweighed. The business judgment changed, I would say, as we were getting close to the 2014 World Cup, and we're losing sponsors, and there were more sponsors that wanted to activate around the team. We changed our practice. Thank you, Ms. Shearer. Your time has expired, but I'll give you a minute and rebuttal. Thank you. Ms. Jones? May it please the Court, Alison Jones on behalf of the Players Association. The only question before this Court is whether the arbitrator was even arguably engaged in contract interpretation when he found the collective bargaining agreement ambiguous with respect to Players Association approval of sponsor print creatives. That's the only question. In their reply brief, the Federation admitted, this is on page 9 of their reply, that it's appropriate to look to past practice if a contract is ambiguous. On page 19 of their reply brief, they admit that the arbitrator's findings are not being challenged here, his findings about past practice. So the only question is about ambiguity, and the question is not whether the contract is or is not ambiguous, because as this Court knows, this Court's role is not to interpret the contract. Rather, the only question is, was the arbitrator engaging in contract interpretation, or was he throwing out the terms of the contract, disregarding them, as this Court has put it, and instituting his own brand of justice? The Federation does not point to anything, nothing, in the arbitrator's award that shows he's looked outside the four corners of the contract when he decided it was ambiguous. Nothing. Looking at past practice? No. In fact, in their reply brief, this is at pages 15 and 16 of the Federation's reply, they are adamant that the arbitrator did not look at past practice when he decided that the contract was ambiguous. They take issue with Art even suggesting that he could do that, but they're very clear he did not look at past practice when he decided that this contract was ambiguous. And that's played out if you look at the arbitrator's decision. Early on in his decision, in the pages between 84 and 87, he looked at Section 6, which is the relevant section about likenesses. Section 6B says, the last sentence, except as set forth below, the Federation may not use or allow others to use player's likeness without the agreement of player or player's representatives. So he looked at that section, he looked at Section 6D, and then he looked at 6F1, the one that begins, if a sponsor uses a player's likeness, then they have to be requested, the Federation has to request a monetary contribution. He looked at all of 6F, including those two phrases, those two provisions, pardon me, and he decided that's ambiguous. No, he decided something wasn't there. Respectfully, Your Honor, he said he looked at those two phrases, and this is on 68 and 67, and it said 6F seems to contemplate that sponsors would use creatives, but there's no approval process set out. Right. It's clearly not there. That's right. So he assumes that approval's necessary, and he gets that, we say, from 6B, because that's the argument that he quoted from the Players Association, but he says the approval process is not set out here. It's silent. And then later, at 105, he makes sure to clarify for the court that it's ambiguous because it's silent. So the silence leads to ambiguity. And this court has been very clear in previous cases that the question of whether a contract is ambiguous is a question of interpretation. So counsel, for example, if you look at the subsection just prior to F, it says Federation shall provide to Players Association a basic form, to the extent such a Federation form is available, for its standard licensing agreement to assist Players Association in soliciting new licensing agreements. So there's a form out there, and they provide that. There's nothing I can find in here that explains how the Federation or the Players Association should go about using that form to solicit new agreements. So is that an ambiguity in this contract? It certainly could be, Your Honor, and that would be within an arbitrator's purview to interpret this contract as ambiguous on that question. And there's nothing in the contract about what color shorts or singlets people should wear or T-shirts. So is this now ambiguous because it is silent on that topic? Well, that's a question of interpretation, Your Honor, and questions of interpretation are for the arbitrator, not for this court. And it's important to back up and realize this is in the collective bargaining arena. So this is an arena in which the Supreme Court has said in the Steelworkers Trilogy that not only contract terms, yes, they exist and they're important, but the Supreme Court has recognized the common law of the shop, which is another word for past practice, is always incorporated into the contract, whether it's explicitly in there or not. The Supreme Court has made that very clear. So although the arbitrator here only looked at the four corners of the contract, he would have been fully within his rights to say the contract says Zippo about this question, whether it's the color of your shorts or whatever you're supposed to wear. But because the common law of the shop exists, I'm going to look and see if there's a bonafide past practice, right? It has to meet a high standard. And if that exists, and if there's not a clause in the contract that prevents me from applying that to the parties, I'm going to apply it. And that's perfectly OK. And to be clear, no such clause exists here. The Federation likes to refer to a zipper clause, but what they really have is a boilerplate integration clause. What you need in a situation like this, if they wanted to prevent the arbitrator from looking at past practice, is a clause like there was in the Anheuser-Busch case. That clause prevented use of, it said that all practices not specifically preserved by the express provisions of the contract were not included. But after steelworkers, you need that if you're going to make sure that you're excluding that. But to be clear here, again, the only question is whether the arbitrator was interpreting the contract when he found an ambiguity. It's not for this court to interpret the contract. The arbitrator's interpretation binds this court. I'll quote from the Illinois American Water Company case. This court said, what matters is not whether this court believes the contract language to be ambiguous, but whether the arbitrator found it ambiguous. So in order to bulletproof him or herself from an appeal, any arbitrator can simply say, I think it's ambiguous. And you're golden? Well, it's a question of interpretation. And to be clear, the Federation has not pointed to a single case ever where this court has seen an arbitrator's interpretation of the award as ambiguous. So a situation where an arbitrator said, this contract is ambiguous, therefore I'm going to interpret it. This court has never, in any case at the Federation sites or that we've been able to find, said, no, we're going to disagree with that contract interpretation and say it is unambiguous, and therefore vacate the award. The Federation points to the Tootsie Roll case and the Polk Brothers cases. But those were not cases where the arbitrator found an ambiguity. Those were cases where the arbitrator said, yes, the contract says X, but I'm going to look at something outside the contract. In Tootsie Roll, it was a handbook, a policy handbook, and in Polk Brothers, it was outside law. And the arbitrator said, I'm going to look to that and use that to base my award on. Again, the Federation identifies nothing outside of the four corners of the contract that the arbitrator looked at or relied on when he decided that this contract was ambiguous. And we respectfully submit that that was a correct determination. Now, again, whether it was correct or not is not for this court. But looking at 6b, which expressly requires player agreement to any use of their likeness, and then 6f, which says if their likeness is used, you have to request money, it's arguably ambiguous. We would say it's pretty clear that you do have to get their approval. But the process for getting approval is ambiguous. Do you go directly to the player? Do you go to the player's agent? Do you go to the player's association? Can you point me to where in the contract, sorry, in the arbitrator's decision, he actually says this is the ambiguous language? So at 68 and 67 of the appendix, it's the clearest place where the arbitrator, he has looked at Section 6. He has outlined the Federation's arguments about how to interpret 6b, 6d, and 6f. He notes that the Federation says that 6b requires player approval. And then at the bottom of 68, he says, however, the UPA clearly contemplates the Federation sponsors might make use of print creatives, which historically they have, but the UPA offers no explicit guidance as to any process to follow for the approval of print creatives proposed by sponsors. So he doesn't say that it's ambiguous. He simply says it's not there. Well, he says that it's silent on this point, therefore it is ambiguous. He's not saying, and I think a good example of this, Your Honor, is in the Northern Indiana Public Service Company case. That was a case where there's a table in the contract that correlated bonuses for employees to operating income for the company. It went up to a certain point, and then it ended. But operating income went off the chart that year. And so the employees said, well, our bonuses should also increase. And the employer said, no, there's nothing in the contract that says your bonus can increase. That's a cap. The arbitrator said the contract is silent. The contract is silent on whether bonuses above the maximum amount given in the contract can be awarded. Because it's silent, I find it ambiguous on that point. It's silent. The silence means ambiguity because of the context. And then the arbitrator looked to past practice and found that, yes, bonuses should go off the chart. And this court affirmed. This court said, that's a question of interpretation. The arbitrator interpreted it. Importantly, a second arbitrator in a different case interpreted that exact same chart and said, no, that's a cap. This is a, it's silent, therefore it's a cap. It's not ambiguous. And this court said both of those, both of those arbitrators were interpreting the contract, therefore they can both be affirmed. It's the only question for this court is, are they interpreting it? And whether something's ambiguous, particularly whether a silence is ambiguous, is a question of interpretation. Now, Judge Mannion pointed to the beginning, the phrasing of the issue, which the parties agreed that the arbitrator should frame the issue. And you point to that the arbitrator referred to whether the text of the agreement or past practice imposes this requirement. We think that's perfectly, it's perfectly easy to read that. And in light of his opinion as a whole, he makes clear in his opinion that, this is on pages 84 and 85, that he's only going to look at the four corners of the agreement to determine whether it's ambiguous. And only, only if it's ambiguous will he look outside. We think that phrasing just means, does the text by itself require this? And if not, if it's ambiguous or silent, does past practice? Now again, he would be perfectly within his rights to look at the common law of the shop, regardless of what the contract says, unless the contract explicitly, explicitly contradicts it. So the either or phrasing doesn't suggest he was doing anything improper. And again, the burdens on the Federation to prove that his award cannot be interpreted in any other way, other than exceeding his role. Now, the Supreme Court has made clear an enterprise wheel, and this court has echoed that in numerous other cases, that ambiguity in an arbitrator's award, so a phrase or a paragraph here or there, that could be interpreted to suggest, oh, maybe he was doing something fishy, that that's not enough. Were you saying that because it's silent, it could be treated as an ambiguity, and given the ambiguity, can look to pass practice? Is it a two-step process that you're looking at? Yes, Your Honor. And the only, the only dispute here, the only thing the Federation disputes, is whether it's ambiguous. And of course, we submit, the question is not whether the contract's ambiguous, that was the question for the arbitrator. The question for this court is whether he was engaged in contract interpretation when he decided it was ambiguous. So when he engaged in it, looking at the four corners, he finds a gap. That's right. And he says that's where it's ambiguous. Right. And that's the end of it. That's the end of this court's analysis. And to be clear, the Federation made all of these arguments that it's making to this court, it made them to the arbitrator, and again to the district court. The arbitrator listened to all of the arguments that the Federation's made here, plus some, and decided, I find the contract language ambiguous. I hear your argument about video creatives, I hear your argument about these other provisions, which were added at other times, and what their implications may or may not be, but I find it ambiguous. So I'm going to move and look to extrinsic evidence, including pass practice. This reminds me of insurance contracts, where all insurance companies keep looking at each other's contracts and court decisions, plugging them in and redrafting them. Sure, sure. And I think that's an important point, that the provision covering print creatives was in the original contract in 1997. The 2001 additions added this video creatives provision, because there's a question about video creatives, are they, they're not really collages, they're not really posters, how do they fit within the terms of this agreement? But the arbitrator didn't find that to be conclusive evidence that somehow the practice has to print creatives as an outchanged. And again, that's clearly a question for the arbitrator. The same thing is true about this defy sound judgment quote that the Federation likes to use. I encourage the court, please look at the context of that. It's on page 105 of the appendix. The arbitrator says, I've already found that the contract is ambiguous. The Federation has pointed me to all of these other provisions elsewhere in the contract that involve approval for other things. I'm going to look at those. The Players Association has pointed me to past practice, and I'm going to look at that. And he says it would defy, quote, defy sound judgment to look at one and not the other in determining the party's intent. He says nothing like what the Federation suggests, which is it would defy sound judgment to reach one conclusion, therefore I'm going to reach another conclusion. Counsel, what about the provision that immediately follows the requirement for preauthorization for video creatives that says, here's why we're so worried about video creatives? Respectfully, Your Honor, it doesn't say anything of the sort. It says that the Players Association has pointed out a particular problem with video creatives, but it's not at all the explanation for video creatives that the Federation says it is. But secondly, of course, that is again a question of contract interpretation, which is for the I would point out that the parties bargained for the arbitrator to decide what the contract means. They bargained for him to do that without review and for his opinion to be final. This Court cannot overturn the party's bargain for agreement and impose its own interpretation of the contract. And I would make one more point, this one about the sort of plausible path to the arbitrator's award. We obviously think there is a plausible path. I'm sorry, Your Honor, may I finish? Finish, yeah. Thank you. There is a plausible path in Section 6, and the arbitrator drew that, but it's highly ironic for the Federation to stand in front of this Court and say there's no plausible way to interpret this agreement to mean that we have to seek Players Association approval when they do not contest that they explicitly told their sponsors. This is on page 113 and 114 of the appendix. They told their sponsors the collective bargaining agreement, quote, requires the approval of the relevant Players Association for the use of all team player likenesses. That's a plausible path. Thank you, Your Honors. We request that you affirm the judgment of the District Court enforcing the arbitration award. Thank you. Ms. Sherry? Thank you, Your Honor. If I could very quickly try to get out a few points. Number one, just to start where we left off as far as what we said to our sponsors, if you look at what they point to, they say that we have executed repeated sponsorship agreements that have this language showing that it comes from the CBA. The only one they point to is a draft agreement that was never executed. There is not a single sponsorship agreement that the arbitrator points to that says that the collective bargaining agreement required us to seek preapproval. They either talk about U.S. soccer approval. They talk about requiring approval as applicable. There's no language in an executed agreement of the sort that they are talking about. The second point I would make with respect to 6B, the suggestion that the arbitrator looked at this except a set forth below language that they point to in 6B is simply not true. If you look at the arbitration award, he doesn't engage in any discussion of that particular language at all, and they rely on that last sentence in 6B. I'd encourage the Court to start from the beginning of 6B and actually read it as a provides the rights that the U.S. soccer has with respect to players' likenesses, and it says the rights are set forth below. You get to F1 when you look below and you find the right that we're talking about here. The third point I would make with respect to Northern Indiana Public Service Company, that is a case where silence was ambiguous because there was a yawning void. The fact is it was a bonus chart, and the company did so well that year that it was literally off the charts, and so the arbitrator needed to figure out what the bonus was going to be. It was not plausibly complete without figuring out what that bonus was. And then just to bring to the last point, the color shorts example, I mean, the consequence of the players' association position here really is quite dramatic. It's that the arbitrator can do whatever he wants. It doesn't matter what the contract says. It doesn't matter that the contract is fully integrated. The arbitrator can look to anything, look to the contract, look outside the four corners of the contract, look to past practice. This court can't review it. That's not this court's, that's not the law in this court. That has never been the law in this court, and it couldn't be. It really would give the arbitrator much more authority than the parties agreed to here. They agreed to allow him to interpret the contract, not to add terms to it, not to rewrite it. That's what happened here. So we'd ask the court to reverse the district court and send it back to vacate the arbitration award. Thank you, counsel. Thanks to both counsel. The case will be taken under advisement.